IN THE DISTRICT COURT OF CLEVELAND COUNTY

STATE OF OKLAHOMA

PATRICIA D. BACHHOFER, an          )
Individual, and SARAH LOUISE       )
STEVENSON, an Individual,          )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )   CASE NO. CJ-2002-843-L
                                   )
G. PAUL KULA, M.D., an             )
individual,                        )
                                   )
            Defendant.             )

* * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF GARY PAUL KULA, M.D.**

taken on behalf of the

Plaintiffs

on December 27, 2002

in Oklahoma City, Oklahoma

* * * * * * * * * * * * * * * * * * * * * * * * * *

Reported by:  CAROL M. JOHNSON, C.S.R.



PLAINTIFF'S
EXHIBIT
tabbies
C

WORD FOR WORD REPORTING, L.L.C.
2220 FIRST NATIONAL CENTER
120 NORTH ROBINSON AVENUE
OKLAHOMA CITY, OKLAHOMA  73102

G. Paul Kula, M.D.

1     A.   Yeah, sure.

2     Q.   During this deposition, I am going to be

3  using a term that I want to give you a definition

4  for.  Any time you want to go back to it, we can do

5  it, because I have got it outlined here in orange and

6  we can come back and read it verbatim.

7          I am going to use the term "sexual

8  relationship."

9     A.   Okay.

10    Q.   And in this deposition, sexual relationship

11 is defined as, "A male/female relationship wherein

12 physical, sexual contact --

13    A.   All right.

14    Q.    -- "such as kissing, petting, fondling,

15 genital stimulation, oral sex and/or sexual

16 intercourse is engaged in or attempted by either

17 party with the other on one or more occasions."

18    A.   Okay.

19    Q.   Have you got that?

20    A.   I understand.

21    Q.   Is it a duty of a reasonably prudent

22 psychiatrist not to have or to entice or to encourage

23 a sexual relationship with a patient under his care

24 to whom he is not married?

25    A.   Absolutely.

G. Paul Kula, M.D.

1    Q.    Why?

2    A.    Because it's part of the medical ethics.

3    Q.    Well, what are -- what are the human impact

4  reasons?

5    A.    Well, because it would end the therapy for

6  one thing.  And it would -- it's an unethical,

7  immoral act.

8    Q.    Can you think of any other reasons why

9  engaging in sexual relationship with a patient who

10  was under your care at that time, can you think of

11  any other reasons why it may be damaging?

12    A.    Well, it might damage their ability to get

13  therapy in the future.

14    Q.    Well, you haven't mentioned any adverse

15  consequences to the patient psychologically.  I guess

16  there are none in your opinion?

17    A.    Well, I am not guilty of any, in these

18  cases that I have said from the beginning.

19    Q.    I didn't ask you that.

20    A.    I know.  Well, I am telling you all I know

21  then.

22    Q.    Okay.  Is this a duty even if the patient

23  initiates the sexual relationship?

24    A.    Yes, it's a duty.

25    Q.    Why?

G. Paul Kula, M.D.

1      A.    Because it's the duty of the physician to
2  have control of the case, more or less.
3      Q.    If a patient initiates a sexual
4  relationship with her psychiatrist, what is the
5  reasonably prudent physician's procedural response?
6      A.    It would be to explain to the patient that
7  this is not what therapy is about and this is not how
8  it's conducted.  And that if this can't be resolved,
9  then they would need to see somebody else.
10     Q.    What should the reasonably prudent
11 physician's procedural response be if the patient
12 persists in trying to initiate a sexual relationship
13 with him?
14     A.    They would probably terminate the
15 therapeutic relationship.
16     Q.    Why?
17     A.    Because if the patient won't ascribe to the
18 recommendations made, then it would be -- you have no
19 alternatives left.
20     Q.    Is there any circumstances where it is
21 reasonably pursuant medical practice for a
22 psychiatrist to initiate or engage in a sexual
23 relationship with a patient he is maintaining a
24 doctor/patient relationship with and is prescribing
25 medicine for and to whom he is not married?

G. Paul Kula, M.D.

1      A.   No.

2      Q.   Why?

3      A.   For the same reasons that I have already

4  mentioned, ethical concerns.

5      Q.   Only for ethical concerns?

6      A.   Well, ethical, moral concerns.  Both.

7      Q.   Nothing else?

8      A.   Well, I suppose the legal consequences.

9      Q.   What about the psychological impact on your

10 patient?

11     A.   Well, there would be a psychological impact

12 on the patient if that happened.

13     Q.   Is there any circumstance where it is

14 reasonably prudent medical practice for a

15 psychiatrist to advise a married woman patient, who

16 is living with her husband, to have an extramarital

17 sexual relationship with another man?

18     A.   No.

19          MR. ROWLAND:  Objection.  Form.

20     Q.   (By Mr. Smith)  And why is that?

21     A.   Because it would be unethical and it would

22 be a poor medical practice.

23     Q.   Have you counseled with people who have

24 engaged in extramarital affairs?

25     A.   Yes.

G. Paul Kula, M.D.

1  have never done that.

2       Q.   (By Mr. Smith)  Why?

3       A.   I just don't necessarily get into that area

4  that much.

5       Q.   If we assume a psychiatrist does engage in

6  a sexual relationship with a married patient, not

7  married to him, with whom he is maintaining a

8  doctor/patient relationship, is it a duty of the

9  psychiatrist to note that fact in his clinical

10  records or any other records pertaining to the

11  patient?

12       A.   Well, I would assume so, yes.

13       Q.   And why is that?

14       A.   Because it would be part of what --

15  whatever you are doing.

16            I can't imagine anybody documenting that,

17  though.

18       Q.   Did you document your sexual relations with

19  your wife when she was a patient with you?

20       A.   No.

21       Q.   If we assume a psychiatrist engages in a

22  sexual relationship with a married patient he is

23  maintaining a doctor/patient relationship with, and

24  prescribing medicine for, what are some of the

25  adverse consequences to the mental health of the

G. Paul Kula, M.D.

1    patient that can reasonably be expected with a

2    reasonable degree of medical certainty?

3         A.    Well, there's a certain amount of -- of --

4    hum, possible depression, post traumatic stress

5    issues.  That's about the best way I can answer that

6    question.

7         Q.    Though you never mentioned his name as a

8    treating physician, I have a letter in my file from a

9    Dr. George H. Guthrey, M.D., Oklahoma City.  Is that

10   a person that you have counseled with?

11        A.    Oh, yes.  He used to be my psychotherapy

12   consultant, more or less, for several years.

13        Q.    Any reason you chose not to tell me about

14   him?

15        A.    I just forgot about him.  I haven't seen

16   him in several years.

17        Q.    Well, I am going to show you a letter,

18   handwritten apparently by him for some reason, July

19   the 8th, 1987.

20             Did you ever get a copy of that letter?

21        A.    No.

22        Q.    Does that look like his handwriting?

23        A.    It looks like it.

24        Q.    Will you read the yellow language down

25   below, please?

G. Paul Kula, M.D.

1      A.    "He has felt very deeply the guilt,

2  remorse, and shame that his professional actions

3  produced.  He has worked very hard with much

4  intrapsychic pain to gain insight into his behavior.

5           "We have explored indepth the

6  psychodynamics of his behavior.  This has included

7  some traumatic earlier life experiences, as well as

8  some more recent marital distress.  These factors

9  play a role in his unprofessional -- played a role in

10 his unprofessional conduct in this single instance.

11          "The insight he has gained, plus the guilt

12 and remorse, will certainly preclude and like --

13 preclude any likelihood of repetition on his part.

14          "Also, he has become quite alert to the

15 functions of caring for females, which make

16 professionals vulnerable to these responses."

17      Q.    That's fine.  Is that an accurate

18 statement?

19      A.    Sure.

20      Q.    So guilt, remorse, shame?

21      A.    I think that was true back in 1986, which I

22 readily admitted to.

23      Q.    You were having an affair with your current

24 wife during the time you were treating her what

25 years?

G. Paul Kula, M.D.

1       A.   It was from 1985, in the summer, through
2   about 1986, in the February.
3       Q.   While you were being counseled with by Dr.
4   George Guthrey, you resumed your affair with your
5   current wife, did you not?
6       A.   Reassumed my affair?
7       Q.   Yes.
8       A.   I saw her again in 1987, on two different
9   occasions.
10      Q.   For sexual intercourse?
11      A.   Yes.
12      Q.   While she was a patient?
13      A.   No, she wasn't a patient.
14      Q.   Was not a patient?
15      A.   Was not a patient.
16           In 1986 after the -- the issue came up of
17  the sexual misconduct, she was no longer a patient of
18  mine after that point.
19      Q.   Did you choose to tell Dr. Guthrey about
20  resuming your relationship with Brenda Kula, now
21  Brenda Kula?
22      A.   I guess I did, yes.
23      Q.   Well, you would expect, then, him to
24  mention something about you re-engaging?
25      A.   I don't know.

G. Paul Kula, M.D.

1    Q.    Were you married at the time you resumed an
2  affair with your current wife in 1987?

3    A.    Well, I only saw her on two occasions, as I
4  said.  And yes, I was married.

5    Q.    So when your own doctor, Dr. George Guthrey
6  talks about you having guilt, remorse, and shame, and
7  will certainly preclude any likelihood of repetition
8  on his part.

9    A.    I think that was written after the fact.

10    Q.    Did -- well, he certainly -- when did he
11  begin counseling you?  He wrote this in July of 1987.
12  We'll get his records and find out.

13    A.    Yes.  Well, I saw her in -- in 1987 in -- I
14  am trying to think.

15    Q.    Well, let me tell you where I am drawing
16  this testimony from.  Directly from the hearing that
17  you had before the Oklahoma Board of Medical
18  Examiners.

19    A.    Right.  Okay.

20    Q.    Now, you were having an adulterous affair
21  with a former patient --

22    A.    Right.

23    Q.    -- at the time you were counseling
24  Dr. George Guthrey about the guilt, shame, remorse
25  you felt over the adultery that you committed with

G. Paul Kula, M.D.

```
1        A.   Yes, I think it's important.

2        Q.   You say that you didn't think you were

3   doing anything wrong when you were having an

4   adulterous relationship with Brenda.  What was her

5   name at that time?

6        A.   Brenda Vanlandingham.

7        Q.   Brenda Vanlandingham, after she ceased

8   being your patient?

9        A.   Yes.

10       Q.   So you see nothing wrong with adultery,

11  obviously?

12            MR. ROWLAND:  Object to the form.

13       Q.   (By Mr. Smith)  Correct?

14       A.   Yes, I see something wrong with adultery.

15       Q.   Well, you said you were doing nothing

16  wrong.  So how do you explain that conflict of

17  values?

18       A.   Well, I guess I didn't think I was doing

19  anything wrong in regards to the probationary period.

20       Q.   Were you doing something wrong in regards

21  to your moral standards?

22       A.   Yes.

23       Q.   Doctor, you have already told us that it's

24  a duty of a psychiatrist, if he exercises a

25  reasonable degree of care, to take measures to
```

G. Paul Kula, M.D.

1   preclude having sexual intercourse with a patient?

2       A.   Right.

3       Q.   People come to you because they have

4   psychological issues, don't they?

5       A.   Yes.

6       Q.   I mean, Brenda Vanlandingham didn't just

7   walk in your office healthy, mental -- mentally alert

8   and all together to talk to a psychiatrist, did she?

9       A.   No.

10      Q.   She had serious issues?

11      A.   Yes.

12      Q.   Don't you consider, whether she's your

13  patient or not, if she was your patient, don't you

14  consider it inappropriate and medically

15  inadvisable --

16      A.   Yes.

17      Q.   -- to continue the affair?

18      A.   Yes.

19      Q.   It would be a breach of your duty --

20      A.   Yes.

21      Q.   -- as a physician to do so?

22      A.   Yes, I erred in that regard.

23      Q.   And you erred in that regard after

24  Dr. George Guthrey had counseled with you, didn't

25  you?

G. Paul Kula, M.D.

1      A.   No.  I think he wrote that afterwards.

2      Q.   Well, he wrote it in July of 1987.

3      A.   I think I -- well, the contact with her was

4  in 1987, prior to that.

5      Q.   Well, that's true.

6      A.   Right.

7      Q.   My point is, you never told him about it?

8      A.   Yes, I did.

9      Q.   Doctor, what is the goal of psychiatry?

10     A.   The goal of psychiatry?

11     Q.   Yes.

12     A.   To reestablish a sense of peace of mind and

13  contentment in patients.

14     Q.   Peace of mind and contentment aren't words

15  that one normally associated -- associates with the

16  psychological repercussion of adultery; isn't that

17  true?

18          MR. ROWLAND:  Object to the form.

19          THE WITNESS:  I suppose not.

20     Q.   (By Mr. Smith)  None of the reasonably to

21  be expected adverse consequences to the mental health

22  of the patient who engages in a sexual relationship

23  with her psychiatrist, are conducive to achieving the

24  goal of psychiatry, are they?

25     A.   No.

G. Paul Kula, M.D.

1    Q.    So this is something that you have, or had,
2  experience with and experience on how to handle;
3  correct?
4    A.    Yes.
5    Q.    Did you ever sense that either Sara
6  Stevenson or Patricia Bachhofer were interested in a
7  sexual relationship with you?
8    A.    No, not at all.
9    Q.    Okay.  And as a psychiatrist, could you
10 deduce these things from the clinical pieces of
11 information you were able to put together?
12   A.    Only in Pat Bachhofer's case, because she
13 was hypersexual and talked about sexual issues a lot,
14 but they weren't aimed toward me.  So I didn't feel
15 personally that she was coming on to me, no.
16   Q.    So she wasn't one of the eight?
17   A.    No, she would be one of the eight.
18   Q.    Okay.  Would you agree with me that a
19 reasonably prudent psychiatrist who will not, or
20 cannot, control his appetite for a sexual
21 relationship with some female patient, has a duty to
22 cease his doctor/patient relationship with that
23 woman?
24   A.    Yes.
25   Q.    Failure to do so would constitute

G. Paul Kula, M.D.

1   unreasonable medical practice in your opinion,

2   wouldn't it, Doctor?

3       A.   Yes.

4       Q.   And why is that?

5       A.   Because it's unethical and immoral, as I

6   have stated.

7       Q.   Is there such a thing as sexual addiction?

8       A.   Some people say so.  I don't know that I

9   particularly believe in that, no.

10      Q.   Okay.  So you don't know what the clinical

11  findings are for determining sexual addition, I take

12  it?

13      A.   No.

14      Q.   Okay.  Is there a recognized means of

15  treating sexual addition?

16      A.   Yes.

17      Q.   What is that means?

18      A.   Apparently you go to a specialized center

19  that deals with sexual addictions and they provide

20  treatment for that.

21      Q.   What is the cure rate of those properly

22  treated for sexual addition?

23      A.   I couldn't say.  Although, I think

24  recent -- I would say I think a recent article that I

25  read suggested that most doctors do not repeat this

G. Paul Kula, M.D.

1       A.   I think it's probably not, no.

2            That's an issue more for clinic -- I mean,

3   child psychiatrist to deal with.

4       Q.   Well, you certainly are certified in child

5   psychiatry, aren't you?

6       A.   I am not, no.  I am certified in

7   adolescent.

8       Q.   Oh, sorry.  Adolescent.

9       A.   Not child and adolescent.

10      Q.   Okay.  Have you ever been a sexual addict

11  or a sexual predator?

12      A.   No.

13      Q.   Of course, if you don't know the signals or

14  the signs for being a sexual addict, you wouldn't be

15  able to know whether you are one, would you?

16      A.   I suppose not.

17           The only indiscretion that I have had was

18  with my -- the woman I am married to now.

19      Q.   I know you keep making that defensive

20  statement, Doctor --

21      A.   Yes.

22      Q.   -- but I didn't ask you about that.

23      A.   Fine.  I'll keep making it.

24      Q.   Have you ever been diagnosed as having any

25  phycological sexual disorder?

G. Paul Kula, M.D.

1      A.   No.

2      Q.   Have you ever been treated for any

3 phycological sexual disorder?

4      A.   Well, I did receive, like I said, some

5 treatment from Dr. Nael following the discovery of

6 this affair and I -- we dealt with issues regarding

7 that then at that point.

8      Q.   And you also dealt with issues regarding

9 that in 1987, with George Guthrey, didn't you?

10      A.   Well, in a sense, yes, I did.

11      Q.   Could a psychiatrist that repeatedly seeks,

12 encourages, and/or takes advantage of or makes

13 ovations for sexual relationship made toward him by

14 his female patients, or made by him toward his female

15 patients, could that pose a threat of danger to the

16 lives of those patients?

17      A.   I wouldn't think so.  Not necessarily, no.

18      Q.   Well, it certainly could, couldn't it?

19      A.   I suppose anything is possible.

20      Q.   Well, we know after your adultery with

21 Brenda Vanlandingham, that you felt, according to

22 Dr. Guthrey, very deeply the guilt, remorse and shame

23 of your professional actions.

24      A.   That's true.

25      Q.   And you have already identified that

G. Paul Kula, M.D.

1    Q.   And if that depression is added to

2  significantly, it lays the potential --

3    A.   Yes.

4    Q.   -- for suicide, doesn't it?

5    A.   I suppose that's possible.

6    Q.   Okay.  On how many occasions have you been

7  in a sexual relationship with a woman who was

8  concurrently a patient of yours?

9    A.   Just once.

10   Q.   On how many occasions have you been a

11  participant in a sexual relationship with a woman who

12  was a former or subsequent patient of yours?

13   A.   Well, that was really the first one.  She

14  was really an ex-patient by the time that we started

15  this relationship.

16   Q.   Well, you have made it very clear she was

17  "a" patient.

18   A.   Well, she was a patient because she

19  continued to take medication that I had been

20  prescribing.

21   Q.   Now, did you come on to your wife in that

22  clinical setting to initiate the adultery, or did she

23  come on to you?

24   A.   She came on to me.

25   Q.   And you accepted?

G. Paul Kula, M.D.

1      A.   Eventually I guess I did, yes.

2      Q.   Well, did she have to just hammer on you to

3   get you to accept, or did you --

4      A.   No, basically yes.

5      Q.   "No, basically yes."  That sounds like

6   something I'd say to my wife.

7      A.   Uh, yes.

8      Q.   So you fought it off and she finally got

9   into the Alamo and you decided, "Yep, we are going to

10   have an affair."  Right?

11           MR. ROWLAND:  Objection.  Form.

12      Q.   (By Mr. Smith)  Correct?

13      A.   Well, I didn't decide we were going to have

14   an affair.  It's just things sort of evolved.

15      Q.   Well, isn't that a choice to have an affair

16   or not?

17      A.   I suppose it's a choice, yes.

18      Q.   If it's a choice, then it's a decision,

19   isn't it?

20      A.   Yes, I guess so.

21      Q.   On how many occasions have you kissed, or

22   attempted to kiss, a patient of yours, or an employee

23   of yours, a nurse or somebody working intimately with

24   you while this person was in your office or in a

25   clinical setting?

G. Paul Kula, M.D.

1        A.    Never.

2        Q.    On how many occasions have you touched the

3    body of a female patient of yours in a way that was

4    intended to arouse the patient or intended to

5    communicate your interest in a sexual relationship

6    with that patient?

7        A.    Never.

8        Q.    Not even with your wife?

9        A.    With my -- in the first instance, yes, I

10    suppose so.

11        Q.    Well, I suppose so.

12              Doctor, it's real important that you tell

13    me the truth to these answers.

14        A.    Well, we are talking about something in

15    1986.

16        Q.    We are talking -- well, that -- is that

17    insignificant because it's in 1986?

18        A.    Well, it was true in 1986, but it's not

19    true in -- in the year 2001.

20        Q.    Is it insignificant because it happened in

21    1986?

22        A.    I suppose you could make it significant if

23    you want.

24              MR. SMITH:  It's five til twelve and I

25    am not suggesting we eat, but I didn't know whether

G. Paul Kula, M.D.

1    Q.    Uh-huh.  Is it the duty of a reasonably
2  prudent psychiatrist to provide his patient with
3  honest therapeutic advice?
4    A.    Yes.
5    Q.    Is it the duty of a reasonably prudent
6  psychiatrist to record the essence of what that
7  advice is in his patient's medical records?
8    A.    Well, to record -- I record pertinent
9  details of the session each -- each time.
10   Q.    I'll ask you one more time.  Is it the duty
11  of a reasonably prudent psychiatrist to record the
12  essence of the advice he gives his patient in that
13  patient's medical records?
14   A.    I suppose you could call it the essence,
15  yes.
16   Q.    Okay.  Why is that important?
17   A.    Well, you need a medical record to -- to
18  follow along with the case.
19   Q.    When you are dealing with 800 patients, as
20  you were at this time, it's very easy for them to
21  fuzz together unless you are able to look at
22  records --
23   A.    Yes.
24   Q.    -- and see what you have advised your
25  patient; right?

G. Paul Kula, M.D.

1    Q.    Okay.  Is it a duty of a reasonably prudent

2  psychiatrist to not over prescribe medicine both in

3  type and dosage?

4    A.    Yes.

5    Q.    Why?

6    A.    Because it's just poor medical practice.

7         You raise the likelihood of side effects if

8  you do that.

9    Q.    Doctor, you would agree, wouldn't you, that

10  we have talked about several duties throughout this

11  deposition.  You have given me your response in

12  almost every instance, if not every instance, said

13  yes, that's a duty.

14         Would you agree with me that the breach of

15  any of the various duties your testimony has

16  confirmed throughout this deposition might amount to

17  medical malpractice?

18    A.    I couldn't say.

19    Q.    Might?

20    A.    I couldn't say.

21    Q.    Well, you mean you couldn't say if somebody

22  breaches the duty to give honest advice, whether that

23  could be medical -- medical malpractice?

24    A.    I don't know enough about that to know if

25  that would constitute medical malpractice or not.

G. Paul Kula, M.D.

1      A.    Well, the State Department of Mental
2  Health, when I admitted to this affair with my
3  current wife, had a -- convened a hearing and they --
4  I am trying to quote what they actually did.
5          They reduced me from senior staff
6  psychiatrist to staff psychiatrist and that was all.
7      Q.    Cut in salary?
8      A.    Yes, there was a slight cut in salary.
9          And they're the ones who reported to the
10  medical board.
11      Q.    Karen McElroy, do you know her?
12      A.    Yes.
13      Q.    She's also reported as hearing you say,
14  "It's Cheryl's birthday.  I wonder what Bruce is
15  going to get her?  I hope he gets her a nice hotel
16  room.  I have told the staff before, every man needs
17  a good fuck on the side."
18          We are now up to four people that heard
19  this.  Are they all wrong?
20      A.    I don't know.
21      Q.    Only you would?
22      A.    Well, I don't know.
23      Q.    Okay.  Do you know Sharon Parker?
24      A.    Yes.
25      Q.    Did you ever make the comment, "Sharon